COURT OF APPEALS
DECISION
DATED AND FILED

May 23, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1241-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2017CF1595

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

DAVID JOHN KILGORE,

    DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Brown County: JOHN ZAKOWSKI, Judge. *Reversed and cause remanded for further proceedings*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.  David Kilgore appeals a judgment of conviction for two counts of first-degree sexual assault and an order denying his postconviction motion for a new trial.  Kilgore contends that his trial attorney was constitutionally ineffective by failing to introduce surveillance video footage at trial.  According to Kilgore, the footage would have impeached the alleged victim's credibility and discredited her testimony that Kilgore sexually assaulted her.

¶2     We agree with Kilgore that his trial attorney performed deficiently by failing to introduce the surveillance video footage and that counsel's deficient performance prejudiced Kilgore's defense.  We therefore reverse Kilgore's judgment of conviction and the order denying his postconviction motion, and we remand for a new trial.

## BACKGROUND

¶3     At about 12:30 a.m. on October 25, 2017, police were dispatched to a Green Bay motel following a report of a disturbance.  The complainant reported that a male and female were in a particular motel room and that the male, who was intoxicated, was refusing to leave.  When officers arrived at the scene, the male was identified as Kilgore, and the female was identified as Rhonda.[1]  An officer ordered Kilgore to leave the premises, and although Kilgore initially left, he returned shortly thereafter stating that he had left his coat in the motel room.  An officer again ordered Kilgore to leave the premises, and when Kilgore refused to

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2021-22), we use a pseudonym when referring to the alleged victim in this case.  All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

do so, he was arrested for disorderly conduct and transported to the Brown County Jail. Later that morning, at about 2:30, Rhonda contacted the police and reported that Kilgore had sexually assaulted her in the motel room.

¶4      The State charged Kilgore with two counts of first-degree sexual assault and one count of second-degree recklessly endangering safety by use of a dangerous weapon. The case proceeded to a jury trial.

¶5      At trial, Rhonda testified that on the night in question, she went to a gas station near the motel where she was staying. At the gas station she encountered Kilgore, whom she had never previously met. Rhonda testified that she left the gas station alone, but she saw Kilgore while she was walking back to the motel, and he asked her for a cigarette. Rhonda agreed to give Kilgore a cigarette and went to get one from her room, which was on the second floor of the motel.

¶6      Rhonda testified that as she entered her motel room, she felt a "nudge," and Kilgore came into the room behind her. Rhonda then sat on one of the beds in the room, took a drink, and gave Kilgore a cigarette. Kilgore sat on the other bed and "just started talking[,] and then it just got really weird." Kilgore started saying things that were sexual in nature and then "grabbed [Rhonda] and threw [her] up against the bed." He got on top of Rhonda, grabbed her neck, and pulled her hair. Rhonda testified that Kilgore had some kind of weapon, like a box cutter or a razor, which he used to cut her neck, stomach, and face. Rhonda further testified that she told Kilgore to stop and tried to push him off of her, but she was unable to do so.

¶7      According to Rhonda, Kilgore took off her shirt, bra, pants, and underwear and "stuck his penis in" her vagina. After that, Kilgore got up, told

Rhonda to "suck his dick," put his penis in her mouth, and ejaculated. Rhonda testified that she then grabbed her phone and cigarettes and told Kilgore that she needed to use the bathroom. From the bathroom, she called a friend, who called the motel clerk. Motel employees then came to the room, but Rhonda testified that she did not tell them what had happened because she was afraid. Rhonda further testified that when the police later arrived, Kilgore told her to "shut [her] mouth" and was "very hostile" with the officers.

¶8    Rhonda testified that an officer took her to her friend's house, and she ultimately told her friend and his father what had happened. They encouraged her to go to the hospital and to call the police, which she did. During Rhonda's testimony, the State introduced photographs showing linear red marks on Rhonda's face, neck, chest, and stomach.

¶9    On cross-examination, Kilgore's trial attorney questioned Rhonda about the beginning of her interaction with Kilgore, and the following exchange occurred:

> Q    You allowed him into the hotel room?
>
> A    Did you hear me? I felt a push and then he walked in the room.
>
> Q    Okay. And at that point you let him stay in the [m]otel room?
>
> A    I guess, yes.
>
> Q    And then you two visited for a period of time?
>
> A    No. Like I said, I was sitting on the bed. I took a drink and that's when everything occurred.

Later on during her cross-examination, when defense counsel suggested that Rhonda and Kilgore had been "drinking together that evening," Rhonda

replied: "Like I said, I had the drink and he could have had and grabbed a drink, and it was not that evening. It was—I don't know how long it was. It was only a matter of time for me to go in the room and grab the cigarette."

¶10 During his cross-examination of Rhonda, Kilgore's trial counsel also highlighted a number of inconsistencies between Rhonda's trial testimony and her previous statements about the assaults. For instance, counsel stressed that Rhonda had told emergency department personnel that she and Kilgore went back to the motel room together and that Kilgore pushed her against a wall, rather than onto a bed. Counsel further questioned Rhonda about statements she made at the hospital that: Kilgore had scratched her with his fingernail, rather than cutting her with a razor or box cutter; Kilgore did not ejaculate; and Kilgore did not use any foreign objects during the assaults. Counsel also questioned Rhonda about her alcohol consumption that night, including the number and strength of the drinks she had consumed.

¶11 Following Rhonda's testimony, the jury heard testimony from one of the motel employees who came to Rhonda's motel room. The employee testified that when she arrived at Rhonda's room, Rhonda looked "afraid and scared" and had a "fresh marking on her cheek." The jury also heard a nurse's testimony that Rhonda was "[a]nxious, tearful, trembling, [and] agitated" while at the hospital. In addition, the jury learned that Rhonda's DNA was found on a penile swab taken from Kilgore.

¶12 Kilgore did not testify in his own defense or present any evidence at trial. The defense's trial strategy was to emphasize the inconsistencies in Rhonda's statements about the alleged assaults and to argue that Kilgore and Rhonda were drinking in her motel room on the night in question and had a

consensual sexual encounter. During discovery, the State provided the defense with surveillance video footage showing the exterior of the motel where Rhonda was staying. The video shows Kilgore and Rhonda on a second-floor balcony outside of Rhonda's motel room at various times on the night in question.[2] The defense did not introduce any portion of the video into evidence at trial.

¶13 The jury found Kilgore guilty of both of the first-degree sexual assault charges but not guilty of the second-degree recklessly endangering safety charge. Kilgore filed a postconviction motion for a new trial, arguing that his trial attorney was constitutionally ineffective by failing to introduce the surveillance video footage at trial. Kilgore asserted that the video showed that he and Rhonda "spent over two hours at the [m]otel, with periods inside the room alternated with time outside smoking cigarettes." Kilgore therefore argued that the video would have impeached Rhonda's trial testimony that Kilgore "pushed his way into her room and assaulted her soon after, and that they did not visit for any period of time." (Emphasis omitted.) According to Kilgore, "[h]ad the jury seen this video, it would have been clear that [Rhonda] had lied under oath … about significant facts," which would have tarnished her credibility and "very likely" given rise to a reasonable doubt "regarding her story of sexual assault."

---

[2] The surveillance video is somewhat blurry and does not include audio. Nonetheless, the circuit court found that the individuals depicted in the video are "likely the defendant and the victim" because the video shows "the officers engaging the defendant near the end of the video consistent with their testimony." On appeal, the State "adheres … to the circuit court's factual finding that the two blurry figures in the video" are "likely" Kilgore and Rhonda. As discussed below, we conclude that the only reasonable inference from the surveillance video is that the two individuals depicted in the video are Kilgore and Rhonda.

¶14     The circuit court held a ***Machner***[3] hearing over the course of two days. On the first day of the hearing, Kilgore's postconviction attorney played the surveillance video for the court and provided her impressions as to what the video showed. On the second day of the hearing, the court heard testimony from Kilgore's trial attorney.

¶15     Trial counsel testified that he reviewed the surveillance video prior to trial and made an "intentional strategic" decision not to play the video because he did not think it "was going to have much of an impression … on the jury." Counsel explained that he did not believe the individuals in the video were identifiable as Kilgore and Rhonda, and even if they were, that would not have changed his opinion about whether to play the video at trial. Counsel noted that the video did not show the inside of the motel room where the assaults allegedly occurred. Counsel further testified that even if the video did show an "inconsistency" in Rhonda's trial testimony, his approach in sexual assault cases is to be "sensitive" about highlighting inconsistencies in a victim's testimony to avoid engendering undue sympathy for the victim among the jurors. In addition, counsel noted that if he had played the video at trial, Rhonda could have simply denied that she was one of the individuals shown in the video.

¶16     The circuit court denied Kilgore's postconviction motion, concluding that his trial attorney's failure to play the surveillance video at trial did not meet the legal standard for ineffective assistance. The court concluded that trial counsel did not perform deficiently because counsel made a "strategic decision" not to play the video at trial and exhibited "a level of professional

---

[3] *See* ***State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

competence providing [Kilgore] with a fair trial." The court further concluded that counsel's failure to play the video was not prejudicial because "[w]hat transpired outside the [motel] room" had "limited value" in showing whether a sexual assault had occurred, and there was other evidence at trial "showing [that] a sexual assault took place consistent with [Rhonda's] testimony." The court reasoned that the evidence presented at trial was "more than sufficient … for the jury to find the State had proven its case beyond a reasonable doubt."

¶17    Kilgore now appeals, arguing that the circuit court erred by rejecting his ineffective assistance claim.

## DISCUSSION

¶18    Whether an attorney rendered ineffective assistance is a mixed question of fact and law. *State v. Nielsen*, 2001 WI App 192, ¶14, 247 Wis. 2d 466, 634 N.W.2d 325. We will uphold the circuit court's findings of fact unless they are clearly erroneous. *Id.* However, whether the defendant's proof is sufficient to establish ineffective assistance is a question of law that we review independently. *Id.*

¶19    To prevail on an ineffective assistance claim, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). For the reasons explained below, we conclude that Kilgore has established both deficient performance and prejudice.

## I.  Deficient performance

¶20    To prove deficient performance, a defendant must point to specific acts or omissions by counsel that are "outside the wide range of professionally

competent assistance." *Id.* at 690. When assessing an ineffective assistance claim, we must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* "[C]ounsel is strongly presumed to have rendered adequate assistance." *Id.* Strategic choices made after a thorough investigation of the law and facts are "virtually unchallengeable" on appeal. *Id.* However, "we cannot ratify a lawyer's decision merely by labeling it … 'a matter of choice and of trial strategy.'" *State v. Felton*, 110 Wis. 2d 485, 502, 329 N.W.2d 161 (1983). Instead, an attorney's choice of strategy must be "objectively reasonable." *See State v. Mull*, 2023 WI 26, ¶35, 406 Wis. 2d 491, 987 N.W.2d 707.

¶21 Here, trial counsel testified during the *Machner* hearing that he made a strategic choice not to introduce the surveillance video at trial, and the circuit court credited counsel's testimony on that point. We conclude, however, that counsel's strategic decision not to introduce the surveillance video was objectively unreasonable under the circumstances.

¶22 At trial, Rhonda testified that Kilgore—a man she had just met at a gas station—followed her back to her motel room, pushed his way into her room, began talking to her about sex, and then almost immediately sexually assaulted her. On cross-examination, Rhonda expressly denied that she and Kilgore "visited" for a time in her motel room before the assaults, stating instead, "I was sitting on the bed. I took a drink and that's when everything occurred." Rhonda also denied that she and Kilgore were "drinking together that evening" before the alleged assaults, stating, "It was only a matter of time for me to go in the room and grab the cigarette."

¶23 The surveillance video directly contradicts Rhonda's testimony about the events leading up to the alleged assaults. The video shows Rhonda arriving at the motel alone and standing outside on the second-floor balcony before moving out of the camera's view in the direction of her motel room.[4] Approximately eighteen minutes later, Rhonda and Kilgore enter the camera's view from the direction of Rhonda's motel room.[5] They stand on the second-floor balcony smoking cigarettes together for about six minutes before moving off camera in the direction of Rhonda's room.

¶24 Rhonda returns to the balcony about fourteen minutes later, and Kilgore joins her shortly thereafter. They both remain on the balcony for about two minutes before leaving again in the direction of Rhonda's motel room. Approximately twenty-one minutes later, Rhonda comes out onto the balcony again and smokes a cigarette, before moving out of the camera's view in the direction of her room. About twenty-six minutes later, the video shows Rhonda and Kilgore leaving the motel together.

¶25 Rhonda and Kilgore return to the motel after about five minutes. They can be seen holding hands as they approach the motel. They proceed to the second-floor balcony and then move out of the camera's view in the direction of

---

[4] Kilgore asserts, and the State does not dispute, that the door to Rhonda's motel room is just off camera.

The surveillance video does not show Rhonda checking into the motel. It merely shows her walking into the motel parking lot, climbing the stairs to the second floor balcony, standing on the balcony, and then proceeding out of the camera's view in the direction of her motel room. Presumably, Rhonda had checked into the motel at some earlier point.

[5] The video does not show Kilgore arriving at the motel before this point. As a result, Kilgore asserts that "[a]t the beginning of the video, [he] is apparently in the room alone."

Rhonda's room. Over the next half hour, the video shows Rhonda returning to the balcony alone on four separate occasions. About thirty minutes after the fourth time that Rhonda leaves the camera's view, two other individuals—apparently motel employees—can be seen climbing the stairs to the second-floor balcony, approaching the door of Rhonda's room, and leaving again after about two minutes.[6]

¶26    About eight minutes later, a police officer arrives on the scene, and Kilgore and Rhonda come into the camera's view on the second-floor balcony from the direction of Rhonda's motel room. Kilgore can be seen walking in front of Rhonda toward the stairs. As Kilgore approaches the stairs, Rhonda is holding his arm, and he pulls his arm away from her.

¶27    In all, the surveillance video shows that Rhonda and Kilgore spent a significant amount of time together at the motel on the night in question. Of particular note, the video shows them spending time on the balcony together on two separate occasions. At another point, they can be seen leaving the motel together and then returning about five minutes later while holding hands. The video therefore critically undermines Rhonda's trial testimony about the circumstances leading up to the alleged assaults—i.e., that she met Kilgore for the first time at a gas station, that he followed her to her motel, and that he pushed his way into her room and sexually assaulted her almost immediately thereafter. We

---

[6] In Rhonda's written statement to police, she stated that when the motel employees came to her room, one of them had a baseball bat. At trial, one of the motel employees similarly testified that the other employee brought a baseball bat to Rhonda's room. The surveillance video shows that one of the two individuals who approached Rhonda's room at the relevant time was carrying a baseball bat, which appears to confirm that these individuals were the motel employees.

agree with Kilgore that, under these circumstances, trial counsel's decision not to introduce the video at trial was objectively unreasonable and therefore constituted deficient performance.

¶28    During the *Machner* hearing, Kilgore's trial attorney provided several reasons for his decision not to introduce the video at trial. First, counsel asserted that he did not believe the individuals in the video were identifiable as Kilgore and Rhonda. That belief was unreasonable. At the end of the video, an officer can been seen approaching and speaking with the two individuals shown in the video. The State does not dispute that the officer in the video is the first officer who arrived at the motel and made contact with Kilgore and Rhonda. Consequently, the only reasonable inference is that the two individuals speaking to the officer in the video are Kilgore and Rhonda and that the same individuals who can be seen earlier in the video are also Kilgore and Rhonda.

¶29    Kilgore's trial attorney also noted that the surveillance video does not show the inside of the motel room where the assaults allegedly occurred. Be that as it may, the video is clearly and materially inconsistent with Rhonda's testimony about the events preceding the alleged assaults. We agree with Kilgore that any reasonable defense attorney would have seized the opportunity to highlight this significant inconsistency in order to suggest to the jury that Rhonda's account of the alleged assaults was not credible.

¶30    Kilgore's trial attorney further asserted that he chose not to introduce the surveillance video at trial because pointing out inconsistencies in a victim's testimony in a sexual assault case can engender sympathy for the victim among the jurors. Counsel explained that in sexual assault cases, the State may argue that such inconsistencies are simply due to lapses in the victim's memory caused by

the trauma the victim has sustained. The State similarly asserts on appeal that the "overarching theme" of Rhonda's testimony was "fear" and that any inconsistencies between the video and Rhonda's testimony "would have been easily explained by the trauma that she had endured."

¶31 As Kilgore aptly notes, however, the differences between the video and Rhonda's testimony cannot be attributed to mere lapses in memory. As discussed above, Rhonda testified to a version of events that differs significantly from what the surveillance video shows. Furthermore, the surveillance video would have undermined any argument that Rhonda was afraid of Kilgore, as it shows that she was with him for an extended period of time on the night in question, which included smoking with him on the motel balcony, leaving the motel with him, and later returning to the motel with him while holding his hand.

¶32 Moreover, we agree with Kilgore that although a defense attorney "does not want to be seen as being unreasonably aggressive with a victim of sexual assault … that does not excuse forgoing an opportunity to prove a significant fabrication that would call into question whether the person is really a victim at all." We also note that Kilgore's trial attorney aggressively cross-examined Rhonda regarding other inconsistencies between her trial testimony and her previous statements about the alleged assaults. Counsel's failure to introduce the video to further impeach Rhonda's credibility was thus inconsistent with his overall trial strategy.

¶33 For these reasons, we conclude that trial counsel's strategic choice not to introduce the surveillance video at trial was objectively unreasonable. Counsel's decision in that regard fell outside "the wide range of professionally

competent assistance," *see Strickland*, 466 U.S. at 690, and Kilgore has therefore met his burden to prove deficient performance.

## II. Prejudice

¶34 Because we conclude that Kilgore's trial attorney performed deficiently, we now consider whether that deficiency prejudiced Kilgore's defense. To demonstrate prejudice, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

¶35 The prejudice analysis for an ineffective assistance claim is distinct from a sufficiency-of-the-evidence test. *State v. Sholar*, 2018 WI 53, ¶44, 381 Wis. 2d 560, 912 N.W.2d 89. "[I]n sufficiency challenges, convictions are upheld when the record shows a bare modicum of evidence from which a reasonable jury could find guilt." *Id.*, ¶45. In contrast, to prove prejudice in an ineffective assistance case, a defendant need only establish a reasonable probability that the jury would have had a reasonable doubt as to the defendant's guilt. *Id.* In other words, to establish prejudice, a defendant need not prove that the outcome "more likely than not" would have been different absent trial counsel's error. *Id.*, ¶44.

¶36 Here, we conclude Kilgore has met his burden to show that his trial attorney's failure to introduce the surveillance video was prejudicial. The defense called no witnesses at trial. Thus, the impeachment of Rhonda's credibility was critical to Kilgore's defense. As discussed above, the video contradicts Rhonda's trial testimony in a significant respect by showing that Rhonda spent an extended amount of time with Kilgore at the motel prior to the alleged assaults. We agree with Kilgore that "[t]he fact that [Rhonda] so greatly mischaracterized the evening

and left out substantial portions of it in her story[] significantly diminishes her credibility as to all events of the evening—including, and most importantly, her story of sexual assault." Consequently, had the video been shown at trial, it would have critically damaged Rhonda's credibility, giving rise to a reasonable probability that the jury would not have believed her testimony that Kilgore sexually assaulted her. Furthermore, if the video had been played at trial, it would have undermined the State's claim that Rhonda was fearful of Kilgore by showing that she spent a significant amount of time with him on the night in question, left the motel with him, and later returned to the motel while holding his hand. On this record, trial counsel's failure to play the video at trial undermines our confidence in the outcome of the proceeding.

¶37     The State argues that trial counsel's failure to play the video was not prejudicial because "the totality of the credible evidence before the jury" shows that there is no reasonable probability of a different result had the video been played at trial. First, the State notes that it introduced evidence showing that Rhonda's DNA was found on a penile swab taken from Kilgore. According to the State, this evidence corroborated Rhonda's testimony that Kilgore sexually assaulted her. However, Kilgore's defense at trial was not to argue that he never had sexual intercourse with Rhonda. Instead, Kilgore argued that he and Rhonda had consensual sex. While the DNA evidence supports the notion that sexual intercourse occurred, it does not corroborate Rhonda's claim that such intercourse was nonconsensual.

¶38     The State also emphasizes that the jury "saw pictures of Rhonda's injuries," which were "consistent with her testimony." While cross-examining Rhonda, however, Kilgore's trial attorney emphasized that Rhonda had told hospital personnel that Kilgore may have scratched her with his fingernail, rather

15

than cutting her with a box cutter or razor. Given that line of questioning, had the jury seen the surveillance video, it may have concluded that the "injuries" depicted in the photographs were scratch marks made by Kilgore's fingernails during a consensual sexual encounter with Rhonda, rather than evidence of a sexual assault.

¶39    The State next asserts that the jury heard evidence that Kilgore was "hostile and combative" when the police arrived at the motel and "would not listen to their directions until being warned with a [T]aser." The State contends that the jury could consider this evidence "as consciousness of guilt." Notably, however, Rhonda did not accuse Kilgore of sexual assault at any point while the police were at the motel. Rather, officers responded to the motel following a report of a disturbance and asked Kilgore to leave the premises. While Kilgore initially complied with that request, he returned to the motel shortly thereafter. Instead of interpreting this behavior as showing consciousness of guilt, the jury could have reasonably inferred that if Kilgore had sexually assaulted Rhonda, he would not have returned to the motel and would have instead taken the opportunity to leave the premises, rather than prolonging his contact with the police.

¶40    The State also notes that multiple witnesses testified that Rhonda was "visibly upset, anxious, and scared" after the alleged assaults occurred. While that is true, the jury was not given the opportunity to weigh the testimony of those witnesses against the events shown in the surveillance video, which differ significantly from Rhonda's trial testimony. Under these circumstances, the likelihood that the jury would have reached a different result had the video been played at trial is significant enough to undermine our confidence in the outcome of Kilgore's trial.

¶41    Finally, the State asserts that the surveillance video would have been merely cumulative because Kilgore's trial attorney impeached Rhonda's credibility in other ways. We disagree. As discussed above, the surveillance video directly contradicts Rhonda's testimony about the events preceding the alleged assaults. In particular, the video shows that Rhonda's testimony about being sexually assaulted by a man she had just met who followed her back to her motel and pushed his way into her room was not accurate. While the video does not prove that Kilgore did not sexually assault Rhonda, it critically undermines important aspects of Rhonda's trial testimony. Trial counsel's cross-examination of Rhonda did not address the discrepancies between her trial testimony and the events shown in the video. On this record, Kilgore has met his burden to show a reasonable probability—that is, a probability sufficient to undermine our confidence in the outcome—that the result of his trial would have been different absent trial counsel's error in failing to play the surveillance video.

## CONCLUSION

¶42    For the reasons explained above, we conclude Kilgore has established both that his trial attorney performed deficiently by failing to play the surveillance video at trial and that counsel's error prejudiced Kilgore's defense. We therefore reverse Kilgore's judgment of conviction and the order denying his postconviction motion, and we remand for a new trial.

    *By the Court.*—Judgment and order reversed and cause remanded for further proceedings.

    This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

17